Mark C. Manning
Mark C. Manning, P.C.
1000 O'Malley Road, Ste. 202
Anchorage, Alaska 99515
(907) 278-9794 Fax 278-9794
manning@alaska.net
Counsel for Defendant

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| MICHAEL JOHN FRICCERO and GINA PERU FICCERO, <br><br> Plaintiffs, <br><br> v. <br><br> ERIC WILLIAM FRICCERO, <br><br> Defendant. | Case no. 3:14-cv-00112-SLG |

## OPPOSITION TO MOTION FOR ATTACHMENT OF FUNDS
### INTRODUCTION

Plaintiffs Mike and Gina Friccero seek an order for the attachment pursuant to AS 09.40.010 *et seq.* and Alaska Rule of Civil Procedure 89 of the proceeds of the sale of defendant Eric Friccero's Alaska limited entry salmon gill net permit. Three Civil Rule 89 prerequisites preclude issuance of an attachment order.

First, pre-judgment attachment is only available for property in this state. AS 09.40.030. Plaintiffs seek attachment of funds in Washington. Accordingly, the court is without power to issue the requested attachment order.

Second, Mike and Gina must show by a preponderance of the evidence that they will probably prevail on an action on an express or implied contract for the payment of money. Their Complaint's second cause of action states such a claim. But there was no contract between the parties.

In addition, the contention rests solely on Gina Friccero's affidavit asserting a verbal agreement that Eric was to remit the proceeds to Mike and Gina upon sale of the permit. Eric directly denies that assertion in his declaration. Furthermore, a family agreement prepared by Mike and Gina

concerning the permit contains no such provision among its several terms. There is no other document, email or other objective evidence supporting the existence of such a term. Finally, in connection with transfer of the permit from Mike to Eric, Mike signed two subsequent documents characterizing the permit transfer as a gift. In one of those documents, signed under oath, called a REQUEST FOR PERMANENT TRANSFER OF ENTRY PERMIT, Mike stated that the permit was not subject to any retained right of repossession or foreclosure, lease, pledge, mortgage, agreement requiring subsequent transfer or other encumbrance. Mike and Gina cannot meet their burden of proof on this evidence.

Third, Mike and Gina must show the absence of any reasonable probability Eric will assert a successful defense. Eric will prove two varieties of illegality. The first is that the retained interest in the permit Mike and Gina claim to have had plainly violates governing statutory and Alaska Supreme court authority prohibiting retained interests. The second is that, if a legally enforceable arrangement were to have existed as alleged, Mike and Gina would have been the real owners of the permit Eric was fishing. They would have enjoyed the benefits of ownership without either of them actually personally fishing the permit, as required by law. Directly applicable Alaska decisional law precludes affording a judicial remedy for a civil claim arising from unlawful activity.

## PROCEDURAL HISTORY

Eric sold his limited entry permit through a Washington State brokerage named The Permit Master. Mike and Gina endeavored to capture the permit sale proceeds with a TRO issued on March 25, 2014, in *Michael John Friccero, et al. v. Mike Painter d/b/a/ The Permit Master and Eric Friccero*, Case no. 14 2 00554 0 (Washington Superior Court). *See Exhibit A to June 20, 2014 Stipulation*. Mike Painter d/b/a The Permit Master interpleaded $142,100.00 in sale proceeds net of commission pursuant to stipulation and order dated April 1, 2014, whereby Painter was dismissed. *Id. Exhibit C*. The Washington action was concluded by stipulation and order dated June 6, 2014. *See Plaintiff's Exhibit 2*. The stipulation provides that the proceeds are to be disbursed to Eric unless an Alaska state or federal court issues an attachment order by July 6, 2014.

## FACTS

Eric Friccero was born on November 19, 1990. *Declaration of Eric Friccero ¶ 2*. He was

adopted by Mike and Gina at about 2 years of age.  *Id.* ¶ 4.  He fished for Mike and Gina commercially as a deck hand on Mike and Gina's gill net vessel, RAINY DAWN, from 2003 through 2007, and fished as a deck hand on Mike and Gina's other gill net vessel, MISS GINA, from 2009 through 2013, with the exception of 2011.  *Id.* ¶¶ 5, 8, 9 & 10.  Gina had acquired a limited entry permit in the divorce of her first marriage, and had transferred that permit to Mike.  *Id.* ¶4.  Eric resided in Mike and Gina's household until moving to California to attend Cal State, Chico after the summer fishing season in 2009.  *Id.* ¶¶ 2, 4.

In 2006, Mike and Gina acquired a second limited entry permit; Gina was its owner.  *Id.* ¶5. Gina had commercially fished years before, but not in recent years.  *Id.* ¶4 & 5.  Gina has always or nearly always had a job ashore unrelated to the commercial fishing business.  *Id.* ¶4.  She was never a "stay-at-home-mom." *Id.*  One job Eric remember Gina held was as teachers' aide at Kodiak High School.  *Id.*  There was never any indication she would actually fish this permit herself.  *Id.* ¶ 5. Instead, the permit was temporarily transferred on medical grounds to 15-year-old Eric to fish on RAINY DAWN.  *Id.* ¶ 5.  Gina again temporarily transferred the permit to Eric to fish in 2006.  *Id.*

In early 2008, Mike and Gina told Eric that Gina's doctor had said he would not sign a medical statement needed for a temporary medical transfer again, so they were going to transfer one of their permits to Eric.  *Id.* ¶6.  There was some discussion that the Fricceros would continue to fish as before, but there was never any discussion or agreement that Eric would never sell the permit, or that if he did, he would give the sale proceeds to either or Mike and/or Gina.  *Id.*  Eric did not pay, or promise to pay, anything for this permit.  *Id.*  There was never any agreement that Eric would do or give anything in exchange for the permit.  *Id.*  Mike told Eric that since he would be receiving this permit and the RAINY DAWN, Eric should not expect any inheritance.  *Id.*

Eric was only 17 at the time, and did not have a detailed knowledge of laws governing Alaska limited entry fishing permits.  *Id.*  But he did know that a permit owner had to be onboard a fishing vessel in order to fish that permit lawfully, except in the case of temporary medical transfers.  *Id.* It was also his understanding that Mike and Gina were arranging things so that Eric could  continue to fish the permit lawfully.  *Id.*  Although Eric thought they were going to transfer Gina's permit to him, they told Eric much later that they had transferred Gina's permit to Mike and Mike's to Eric.

*Id.*

Eric saw his parents preparing some paper work in their home office on March 7, 2008. *Id.* ¶7. They told him they were preparing paperwork pertaining to the transfer of the permit, and they had him sign documents. *Id.* The first, signed on May 8, 2008, was a 2-page agreement that is identified as Exhibit 1 to Mike and Gina's MOTION FOR ATTACHMENT OF FUNDS HELD BY WASHINGTON COURT. *Id.* A true and correct copy of that document is attached to Eric's declaration as Exhibit 1. *Id.* Mike and Gina told Eric that this was not a legally binding contract, but rather an agreement within the family. *Id.*

Eric never signed any other such agreement with Mike and/or Gina containing any other provisions, except that a few days later, they had him sign "Purchase Agreement- Salmon Permit." *Id.* A true and correct copy of that document is attached to Eric's declaration as Exhibit A. *Id.* The document states that the permit is a gift, which was Eric's understanding at the time based on what Mike and Gina had said to him. *Id.*

A short time later, Mike and Gina had Eric sign a third document, entitled REQUEST FOR PERMANENT TRANSFER OF ENTRY PERMIT, a copy of which is attached to Eric's declaration as Exhibit B. *Id.; June 20, 2014, Stipulation Exhibit B.* There is handwriting at the bottom of page 2 that appears to be Mike's. *Id.* The statement "transferring my permit to my son as gift" accords with what Eric understood was occurring, except that he assumed Gina's permit was the one that was to be given to him. *Id.* The statement "receiving wife's due to health problem" also accords with Eric's understanding that the transfer was being made because Gina was no longer medically able to fish a permit. *Id.* Permit owners are supposed to fish their permits, except when medical or other causes temporarily leave them unable to do so. "Will continue to be in fishery with son (instead of wife)" reflects the assumption that Eric would fish the permit on Mike and Gina's boat as before, but leaves the false impression that Gina was "in the fishery." *Id.* She had not fished a permit or worked on a commercial fishing vessel for many years. *Id.*

Mike and Gina had Eric sign a fourth document, a true and correct copy of which is attached to Eric's declaration as Exhibit C. *Id.*

Mike and Gina did not transfer the permit to Eric for the special reason of enabling him to

fish on the RAINY DAWN.  *Id.*  From Mike and Gina's standpoint, the transfer to Eric  just allow things to continue as they had since 2003, when Eric first started fishing on the RAINY DAWN as a deck hand, and for 2006 through 2008, when their second permit was acquired, with them to receive the revenue from the fishing of 2 permits and 2 boats, RAINY DAWN and MISS GINA. *Id.*

Mike and Gina disposed of RAINY DAWN before the 2009 season.  *Id.*  ¶9.  Thereafter, Mike and Eric fished their permits on MISS GINA.  *Id.*  Being able to fish two permits on the one vessel rendered that vessel more productive.  *Id.*

Eric continued to receive a partial crew share from Mike and Gina.  *Id.*  This was acceptable to him at the time, because Mike had said that they would pay Eric's college tuition, a commitment they did not honor past Eric's Fall 2012 semester.  *Id.*  There was also no agreement that Eric would fish the permit essentially for Mike and Gina, in their fishing business, forever or for any particular period of time.  *Id.*  Eric did not agree that the permit was to remain a "family asset" to be fished for the benefit of Mike and Gina's family "in the years to come."  *Id.*  Based primarily on Mike's remarks about getting Eric into a boat one way or another, Eric thought he would transition into his own boat and fishing operation once he had completed college with their help.  *Id.*

Eric was not medically able to fish the permit in 2008 because a leg injury he suffered during the 2007 season had not adequately resolved.  *Id.*  ¶9.   The permit was temporarily medically transferred to Allan Parks to fish on the RAINY DAWN.  *Id.*  Eric fished the permit on the MISS GINA in 2009, 2010, 2012 and 2013.  *Id.*  He did not fish in 2011 because of a medical problem that ultimately resulted in his decision to stop commercial fishing after the 2013 season.  *Id.*  The permit was temporarily transferred to Greg Wallace, Jr., to fish on the MISS GINA for that season.  *Id.*

In December 2010, Eric broke a bone in his left wrist joint.  *Id.*   Surgery was performed in March 2011.  *Id.*   In July 2011, Eric had a second surgery to remove hardware.  *Id.*  In August, it developed that Eric's body was rejecting the March cadaver bone graft.  *Id.*  In November 2011, Eric had a final surgery at the Mayo Clinic, in which his own vascularized bone material was engrafted and at least one screw installed, which he saw on X-rays.  *Id.*

One of his doctors told Eric that he should transition to another line of work than commercial

fishing because of the wrist. *Id.* Eric was told to expect arthritis to develop within 10 years. *Id.*

Eric was able to fish by the beginning of the 2012 season, but both the work imposed on the wrist by commercial fishing and cold weather and water made the wrist very painful every day. *Id.* This problem persisted though the 2013 season, prompting Eric to decide to take his doctor's advice, both because of the pain and in the hope that to do so would defer the development of arthritis. *Id.* Mike and Gina at this time that Eric did not want to continue fishing. *Id.*

Eric attended Cal State, Chico through the 2009-2010 school year and the 2010 Fall semester, but dropped out in the middle of the 2011 Spring semester due to the wrist surgery and the emotional blow of his then-19 year old year old sister Demi dying from alcohol poisoning. *Id.* ¶11. He did not resume attending Chico in Fall 2011 because he was told that the cadaver bone graft in his wrist was being rejected and that additional surgery would be needed, which occurred in November 2011. *Id.* He resumed attendance at Cal State, Chico for the 2012 Spring semester, and attended the 2012-2013 year. *Id.*

Mike stopped paying for after the Fall 2012 semester. *Id.* ¶12. Mike also had paid for Eric's dorm room in his freshman year. *Id.* During the 2011-2012 year, Mike and Gina helped with apartment rent, but said they would be taking the money out of Eric's 2012 crew share, which they did. *Id.* Eric has paid for all his own food and textbooks. *Id.* Eric was able to fund the Spring 2013 himself, but then ran out of funds. *Id.* He did not drop out of college in the fall and winter of 2013. *Id.* He wanted to continue with the 2013-2014 school year, but did not have adequate resources. *Id.*

Eric needs another 2 semesters to finish his Bachelor's degree in Business Administration. *Id.* He had intended, and still intends, to resume college with permit sale proceeds. *Id.* Eric had attended Chico under the WUE program, at reduced tuition. *Id.* ¶18. The program prohibits using time in California attending college to count towards qualifying for resident tuition. *Id.* Eric's understanding is that, because 4 years have passed since his commencement of WUE, he cannot continue further in that program. *Id.* Consequently, he must pay full non-resident tuition of about $25,000.00 per year to complete his degree. *Id.*

Eric listed his Alaska limited entry permit for sale at $145,000.00 with a Washington State brokerage called "The Permit Master." *Id.* ¶17. In March 2014, The Permit Master notified him that

it had a buyer. *Id.* The brokerage fee was $2,900.00. *Id.* In connection with closing the sale, Eric completed and sent to The Permit Master the Alaska Limited Entry Commission form to convey ownership to the buyer, entitled REQUEST FOR PERMANENT TRANSFER OF ENTRY PERMIT. *Id.* As far as Eric knows, the sale was closed, and he is no longer the owner of the permit. *Id.*

If the proceeds are held in court until this suit is completed, Eric will be set back in obtaining his bachelor's degree; he will not be able to resume college until the semester following release of the funds. *Id. ¶21.* His entry into the job market as a holder of a bachelor of arts in business administration, and his employment as same, will be delayed commensurately. *Id.* In addition, Mike and Gina shorted Eric on his 2013 crew share, leaving him unable to pay his 2013 income tax. *Id. ¶¶14 & 18.* Eric is presently unemployed, living in a difficult job market without a degree. *Id. ¶18.*

Mike and Gina have tried to cast doubt on Eric's competence and motives with various false representations about his intentions, responsibility, mental state and alleged "strained" family relationship. *Id. ¶¶ 12 - 20.* To the contrary, he just wants the funds needed to move forward with his life.

## ANALYSIS

1. **Alaska Limited Entry Fishing Program**

This action revolves around Eric Frcciero's ownership and sale of an Alaska limited entry fishing permit. Limited entry permits are issued in accord with the Alaska Limited Entry Act. AS 16.43.010 *et seq.; Grunert v. State,* 109 P.2d 924, 932-935 (Alaska 2005). A limited entry permit authorizes the permittee to operate a unit of gear within a specified fishery. AS 16.43. 150(a). The permittee must have the permit in possession at all times when engaged in the operation of the unit of gear. *Id. (b).* The permit holder must be present at all times when the gear is operated. AS 16.43.140(b); *Grunert v. State,* 109 P.2d at 934. "[A] central premise of the statutory scheme is that the permit holder is an individual who will fish. *Grunert v. State,* 109 P.2d at 934.

Limited entry permits are transferable. AS 16.43.170.; *Diksen v. Troxell,* 938 P. 2d 1009, 1011 (Alaska 1997). But "[a] transferor of a limited entry permit may not retain a property interest in the permit." *Id. at 1011.*

> Except as provided in [exceptions not here relevant] an entry permit may not be
> (1) pledged, mortgaged, leased, or <u>encumbered in any way</u>;
> (2) transferred with any retained right of repossession or foreclosure, or on any condition requiring a subsequent transfer ....

AS 16.43.150(g)(emphasis added); *Diksen v. Troxell,* 938 P. 2d at 1011.

For example, Leonard Pavone transferred his permit to his son for no consideration, in order to qualify to hold an interim-use permit in connection with his application for another limited entry permit. *Pavone v. Pavone,* 860 P.2d 1228 (Alaska 1993). According to Pavone, his son verbally agreed to give the permit back if the application were denied. *Id. at 1230.* When the son later refused ot return the permit, Pavone sued to recover it. The Alaska Supreme Court declined to enforce the alleged illegal agreement to retransfer the permit. AS 16.43150(g)(2); *Pavone v. Pavone,* 860 P.2d at 1231-32.

Likewise in *Brown v. Baker,* 688 P.2d 943 (Alaska 1984), the court held that a promise in a permit purchase money promissory note to return the permit if the debt were not paid was unenforceable. *Id.* at 947-948. The holders of the note tried and failed to avoid this outcome, by arguing the language in the note was not a right of repossession, encumbrance or interest in the permit, but merely a covenant or promise to return the permit. *Id. at 947.*

In short, limited entry permits are to be conveyed free and clear of any residual claims by the transferor, and are not to be encumbered "in any way." AS 16.43.150(g).

### 2. **Elements of Prejudgment Attachment**

The motion for pre-judgment attachment is brought pursuant to AS 09.40.010 *et seq.* *MOTION FOR ATTACHMENT OF FUNDS; MEMORANDUM IN SUPPORT OF MOTION at 8* (sic). This Alaska statutory remedy is also governed by Alaska Rule of Civil Procedure 89, and is available to Plaintiffs in this court by reason of Federal Rule of Civil Procedure 64. Before Eric may be deprived of his property by pre-judgment attachment, he is entitled to the due process protections afforded by the line of cases following *Sniadach v. Family Finance*, 395 U.S. 337 (1969) and *Fuentes v, Shevin*, 407 U.S. 67 (1972). *Etheridge V. Bradley,* 502 P. 2d 146, 147-49, 151-53 (Alaska 1972).

The only property that may be attached is "property in the state...." AS 09.40.030. In

addition, the movant may only seek attachment on a claim based on an action on an express or implied contract for the payment of money. AS 09.40.010; Alaska R. Civ. P. 89(b). The movant must show by a preponderance of the evidence that the movant will probably prevail on the contract claim. Alaska R. Civ. P. 89(d). Further, the movant must show the absence of any reasonable probability Eric will assert a successful defense. *Id.* Finally, the movant must give a written undertaking with qualified sureties to protect the defendant from damages he may experience if the attachment is discharged because the movant was not entitled to it. AS 09.40.020; Alaska R. Civ. P. 89(a), (g) & (h).

"The sum specified in the undertaking shall be equal to the amount claimed by the plaintiff, but not less than $100." AS 09.40.020.

### 3. **Plaintiffs are not entitled to pre-judgment attachment.**

A. The proceeds are not property in Alaska.

Plaintiffs have moved "for an order attaching the funds, in the amount of $142,100, held by the Superior Court of the State of Washington...." *DR-5.* The funds abide in the registry of the court in *Michael John Friccero, et al. v. Mike Painter d/b/a/ The Permit Master and Eric Friccero*, Case no. 14 2 00554 0 (Washington Superior Court). *DR 5-1 at 3-4.* The statutory remedy of attachment only extends to "property in the state." AS 09.40.030. Accordingly, the remedy of attachment is not available to Plaintiffs.

B. Plaintiffs have not shown they will probably prevail on a claim based on a contract for the payment of money.
(1) There was no contract.

The arrangement Plaintiff's allege was no contract. Mike Friccero fished a limited entry permit on RAINY DAWN. Thirteen-year-old son Eric started working for Mike every salmon season as a deck hand on RAINY DAWN in 2003. In 2006, Mike and Gina acquired a second limited entry permit, with Gina as owner. No doubt this commercial asset was acquired for the usual reason: to make more money. But Gina never actually fished the permit. For 2006 and 2007, she temporarily transferred the permit on medical grounds to Eric, who continued fishing as a deck hand for Mike and Gina, but allowing a unit of gear to be operated because he held a permit and was on

the boat.

In 2008, stymied in that approach, Mike and Gina caused ownership to be passed to Eric as a gift. Eric paid nothing for the permit. Except for 2008 and 2011, when medical issues precluded him from fishing, Eric continued on as a deck hand for Mike and Gina, allowing them to make more money because he was a permit-owning deck hand. The provisions in the "family agreement" Mike and Gina had Eric sign are obviously designed to try to retain control over the permit.

The verbal term they claim, that all agreed Eric would pay Mike and Gina the fair market value of the permit if he ever sold it, would, if true, underscore that they considered Eric a mere permit holder in name only, enabling them to benefit their own operation.

If there is some legal or equitable theory available to Mike and Gina on which to cover the proceeds of sale, it is certainly not the existence of a contract for the payment of money. Accordingly, prejudgment attachment is not available to them.

(2) <u>If there was a contract, it did not contain the required term for the payment of money by Eric</u>.

The only evidence Plaintiffs adduce to support the existence of a contract term pursuant to which Eric was to pay money is Gina's assertion that "it was also stated that if the permit were sold Eric would pay the family the fair market value for the permit." *DR 6-1 ¶20 at 5*.

Rebutting that slender bit of evidence is the following. First, Eric avers there was no such agreement. *Declaration of Eric Friccero* ¶6. Second, Mike and Gina prepared a set of *desiderata* they wanted to govern the permit, and that document contained no reference to any obligation in the event of sale or of developments, such as medical issues, precluding Eric's continued use of the permit. *DR 5-1 at 1 & 2.* If there were such a term, surely it would have been included. Third, on the REQUEST FOR PERMANENT TRANSFER OF ENTRY PERMIT, Mike told the State of Alaska under oath that the gifted permit was being transferred without any terms or conditions. *Stipulation June 20, 2014, Exhibit B at 2.* Fourth, use of the word "gift" implies outright ownership. If Mike and Gina's position were enforced, there would only have been a loan of the permit for as long as Eric wanted to or could use it, after which he would be obliged to either retransfer it to Mike and Gina, tender sale proceeds to them, or let it expire.

In the face of this rebuttal evidence, Plaintiffs cannot meet their burden of showing they will probably prevail.

> C. Plaintiffs cannot show Eric has no reasonable probability of asserting a successful defense.

"Generally, courts leave parties to an illegal bargain where they find them and will grant no remedy to either party." *Pavone v. Pavone,* 860 P.2d 1228,1231 (Alaska 1993). If Plaintiffs allegations were given the meaning they assert, their permit arrangement would be illegal in two ways. First, they would have Eric be a permit "owner" in name only, with true ownership and control retained by Mike and Gina. Mike and Gina would have enjoyed the financial benefit of "their" two permits being fished without both of them actually being present while the units of gear were being fished. But control may not be retained. AS 16.43.150(g). And the permit holder must be present at all times when the gear is operated. AS 16.43.140(b); *Grunert v. State,* 109 P.2d at 934. "[A] central premise of the statutory scheme is that the permit holder is an individual who will fish. *Grunert v. State,* 109 P.2d at 934. An arrangement in which Eric was not a true owner, but was just standing in for Gina while she remained employed ashore, would violate the essence of the limited entry fishing program.

Second, giving legal effect to the agreement Mike and Gina allege would violate AS 16.43.150(g). A permit may not be encumbered <u>in any way</u>. *Id (1).* If the allegation that there was an agreement pursuant to which Eric was obliged to remit fair market value upon sale were true, then the permit would have been encumbered with that conditional obligation.

In addition, a permit may not be transferred with ay retained right of repossession or on any condition requiring subsequent transfer. The right to receive sale proceeds is equivalent to a prohibited retained right of repossession. *Id. (2).* A retained right to retransfer of the permit would be clearly prohibited; the subterfuge of a retained right to the fair market value of the permit is a transparent violation of statute.

In summary, Eric has more than a reasonable probability of prevailing on an illegality defense, so the attachment motion must be denied.

**4.     Even if Plaintiffs are other wise entitled to an attachment order, before the order is issue they must post an undertaking in the required amount.**

No attachment order may issue in this case until and unless Plaintiffs post with acceptable sureties a written undertaking in the amount of the sum they seek to attach, $142,100.00.  AS 09.40.020.  That may not suffice to protect Eric against damages suffered by reason of unfounded attachment.  He needs funds to pursue his college degree, with which to secure a good job.  *Declaration of Eric Friccero ¶ 21.*  If the funds are attached and held pending the conclusion of this case, common experience with the time required to resolve civil suits means that his entry into the job market will be delayed at least a year.  It would follow that his worklife would be reduced by a year.  He would still earn his first year, but would lose his last, when his earnings rate would presumably be at its peak.  In addition, he needs the funds to pay his 2013 income tax, having been shorted on his crew share.  *Id.*

## CONCLUSION

Attachment should be denied because the property Plaintiffs seek to attach is not in this state.  Even if the funds could be attached, the motion must be denied because Plaintiffs cannot meet their burden to show that they would probably prevail on a clam based on a contract for the payment of money.  Nor can they show that Eric does not have a reasonable probability of prevailing on an illegality defense.  Finally, no attachment order may issue until an undertaking with sureties is posted.

DATED at Anchorage, Alaska, this 23d day of June, 2014.

s/ Mark C.  Manning
Mark C.  Manning
MARK C.  MANNING, P.C.
Counsel for Plaintiff
1000 O'Malley Road, Ste. 202
Anchorage, AK 99515
Phone: (907) 278-9794
Fax: (907) 278-1169
manning@alaska.net
ABA No. 8110066

I certify that a copy of the foregoing
has been served electronically on
06 /23 /14 on

Jill C. Wittenbrader, Esq.
506 Marine Way, Ste. 3
Kodiak, AK 99615

   s/ Mark C. Manning